IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Jay J. Schindler, | C/A No. 3:12-cv-00293-JFA |
| Plaintiff, | |
| vs. | **ORDER ON MOTIONS**<br>**FOR JUDGMENT** |
| Unum Life Insurance Company of America, | |
| Defendant. | |

## I.    INTRODUCTION

This case involves Plaintiff Jay J. Schindler's (Dr. Schindler's) claims for long term disability benefits under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(1)(B), and for attorney's fees pursuant to 29 U.S.C. § 1132(g). The disputes in this case center on Dr. Schindler's employment as a neurosurgeon with Regional Health Physicians, Inc. (RHP) in Rapid City, South Dakota. RHP maintained long term disability coverage with Defendant Unum Life Insurance Company of America (Unum) as part of RHP's employee welfare benefit plan.

After learning that he had been diagnosed with multiple sclerosis, Dr. Schindler applied for long term disability benefits with Unum. In general, Unum determined that Dr. Schindler had not worked the required minimum number of hours per pay period after October 16, 2009, and thus it found that his coverage ended prior to his date of disability, January 1, 2010. Accordingly, Unum denied benefits. Dr. Schindler filed two appeals with Unum, each time submitting additional evidence that he had worked the required minimum. After Unum denied his second appeal, Dr. Schindler filed the instant suit.

The primary issue before this court is whether Unum abused its discretion in denying Dr. Schindler's claim. For the reasons set forth below, after carefully considering the record in this case and the arguments of counsel at a hearing held on July 11, 2013, the court finds in favor of Dr. Schindler.

## II.    FACTUAL OVERVIEW

The court finds the following facts, all taken from the Administrative Record, relevant to this case. *See* Joint Stipulation Ex. 1, ECF Nos. 41-1 to -30 (hereinafter "AR"). Dr. Schindler is a neurosurgeon who previously practiced extensively throughout South Dakota. In particular, Dr. Schindler served as a *locum tenens* physician for Rapid City Regional Hospital (the Hospital or RCRH) between 2004 and 2007. AR 837. Dr. Schindler entered into an employment agreement with RHP on April 30, 2007, *see* AR 881–904, and he worked for RHP through March of 2010. During his years practicing in South Dakota, Dr. Schindler developed and served a very large client base. *See* AR 209; 859; 861; 871. Notably, for most of his career with RHP, Dr. Schindler was one of only two neurosurgeons in the Rapid City region, the other of whom retired in late 2009. *See* AR 861–62, 875. In addition, Dr. Schindler was the only neurosurgeon in Aberdeen, South Dakota until he became disabled. AR 838.

Dr. Schindler's employment with RHP encompassed a wide variety of duties, including both clinical and operative neurosurgical practice. Among other duties, his contract specified that he was to provide medical services in his specialty to RHP's patients, to perform a certain amount of neurosurgery "on call" coverage at the Hospital, to maintain regular office hours at RHP's clinics, to supervise physician assistants and nurse practitioners, to establish a neurosurgery outreach clinic in Aberdeen, South Dakota and provide services there at least twice monthly, and to actively participate in quality assurance, peer review, performance improvement

and risk management programs and requirements.  *See* AR 882–83; 886; *see also* AR 840–41.

With respect to the Aberdeen Clinic, which is more than 300 miles from Rapid City, RHP hired a

pilot to fly him there twice monthly.  *See* AR 3703–04.  In addition, Dr. Schindler had full

privileges at the Hospital, where he performed surgery on his patients and where he continued to

work as a *locum tenens* physician.[1]  *See* AR 837, 839–40.

Dr. Schindler was a salaried employee, AR 78, and RHP did not require him to punch a

time clock or keep track of or report his hours worked to RHP, *see* AR 191; 3707; 3699–700.

Because Dr. Schindler frequently worked long hours, however, his wife encouraged him to

independently keep track of his hours worked.  AR 876.  Dr. Schindler kept track of these hours

on their family calendar.  *Id.*; *see* AR 2039–64.

Effective March 1, 2008, Dr. Schindler became a participant in RHP's group long term

disability plan (the Plan).  *See* AR 123. RHP, the Plan Administrator, delegated to Unum

discretionary authority to make benefit determinations under the Plan.  AR 161; *see* Def.'s Mem.

Supp. J. 31, ECF No. 42.  Benefits are also paid by Unum, as insurer of the Plan.  AR 155.  The

court finds the following provisions of the Plan relevant to the disposition of the instant case.  In

a section with the heading "*WHEN DOES YOUR* COVERAGE *END?*," the Plan states:

> Your coverage under the policy or a plan ends on the earliest of:
> -   the date the policy or a plan is cancelled;
> -   the date you no longer are in an eligible group;
> -   the date your eligible group is no longer covered;
> -   the last day of the period for which you made any required contributions; or
> -   the last day you are in active employment except as provided under the covered layoff or leave of absence provision.

---

[1] Though the Hospital and RHP have the same parent company, Regional Health, Inc., the Hospital is a separate entity from RHP.  *See* Pl.'s Mem. Supp. J. 1–2.  Dr. Schindler did not have an employment agreement with the Hospital.

AR 129.  The Plan specifies as "eligible groups," among others, "[p]hysicians in active employment in the United States with the Employer."  AR 123.  The Plan defines "active employment" to mean that

> you are working for your Employer for earnings that are paid regularly and that you are performing the material and substantial duties of your regular occupation. You must be working at least the minimum number of hours as described under Eligible Group(s) in each plan.
>
> Your work site must be:
>
> your Employer's usual place of business;
> an alternative work site at the direction of your Employer, including your home;
> or a location to which your job requires you to travel.
>
> Normal vacation is considered active employment.
> Temporary and seasonal workers are excluded from coverage.

AR 151.  In addition, the "minimum hours requirement" specifies that "[e]mployees must be working at least 34 hours per pay period."  AR 123.  Finally, the plan notes that "[i]f you are absent from work due to injury, sickness, temporary layoff or leave of absence, your coverage will begin on the date you return to active employment."  AR 128.

Dr. Schindler performed his duties as an employee of RHP for several years.  In 2009, however, he began to experience back and leg pain, difficulty walking and maintaining balance, reduced stamina, lack of sleep, temperature intolerance, and bowel and bladder complaints.  *See* AR 209–12; 507–08; 845–47.  As Dr. Schindler began to experience these symptoms, which he initially attributed to a history of lower back pain, RHP provided a number of measures to accommodate them while he worked.  For example, RHP purchased a cooling vest for his use in the operating room in early 2009, it purchased a set of steps for him to use in the operating room so that he could support his body weight while he worked over patients, and it reimbursed Dr. Schindler for a brace to wear during surgery.  AR 508.

4

At some point during 2009, a conflict began to develop between Dr. Schindler and the Hospital regarding the use of certain instrumentation in his surgical practice. In particular, it appears that there was an ongoing, intense disagreement regarding the justification for and the cost of instrumentation used in particular spinal fusion procedures. AR 844; *see* AR 874; 1138–43. Then, on October 14, 2009, the Hospital informed Dr. Schindler by letter that it was implementing a precautionary suspension of Dr. Schindler's instrumented cervical and lumbar spinal fusion privileges.[2] *See* AR 513; 1558–59. This suspension was based on an investigation into five of Dr. Schindler's cases identified by the Medical Staff Quality Review Committee and at the suggestion of others. AR 520; *see* AR 546. The Hospital instituted a process of peer review of these cases, ostensibly to investigate the quality of care Dr. Schindler provided, and this process continued throughout his LOA. *See* AR 522–23. As part of the peer review process, Dr. Schindler had to review relevant medical records, address questions and issues posed by an external reviewer hired by the Hospital, and prepare reports regarding his care of these patients.[3] *See* AR 520; 560; 848–49; 1449–64; 1564–1635.

Dr. Schindler's symptoms did not abate. In light of his weakness, the conflict with the administration of the Hospital regarding certain instrumented spinal fusions, and his suspension of privileges from performing certain of these procedures, on October 15, 2009 he requested that the Hospital allow him to take a temporary leave of absence (LOA) from his surgical practice at the Hospital. *See* AR 209; 513–14; 846. In part, this letter states that a LOA "would accomplish two ends." AR 513. First, he would not have to be suspended, an event which requires a report to "the Division of Practitioner Data Banks." *Id.* And second, a LOA would "allow the

---

[2] This apparently affected only Dr. Schindler's elective instrumented spinal fusions, not his non-elective instrumented spinal fusions or any other neurosurgical procedures. *See* AR 733; 844–45.
[3] Indeed, this was one of the requirements of his employment contract with RHP, as noted above.

investigation to proceed in an unfettered fashion" without having to worry whether the investigation would be completed during the period of suspension.  AR 514.

On October 16, 2009, the Hospital accepted Dr. Schindler's request for a LOA.  AR 517.  Importantly, Dr. Schindler's LOA did not extend to his clinical practice, as he did not take a LOA from his employment with RHP.  *See* AR 514.  For its part, RHP alleged in a letter to Dr. Schindler dated October 16, 2009 that the "provision of surgical services at RCRH [was] a primary duty of [his] employment with RHP."  AR 518.  However, Dr. Schindler's employment contract does not mention surgery, *see* AR 881–904, and in an email to counsel for Dr. Schindler dated October 19, 2009, RHP agreed "that Dr. Schindler should continue with his clinic work as an employee of RHP."  AR 1163.

Still, as a result of Dr. Schindler's LOA, relations between Dr. Schindler and RHP began to sour.  In particular, shortly after Dr. Schindler notified the Hospital of his LOA, on October 29, 2009 RHP notified Dr. Schindler that it planned to substantially reduce Dr. Schindler's compensation.  AR 525–26.  Counsel for Dr. Schindler responded to this proposal on November 3, 2009 and demanded that Dr. Schindler's pay be continued at its then-current level in accordance with the contract between Dr. Schindler and RHP.  AR 527–28.  In this letter, counsel for Dr. Schindler wrote: "It must be emphasized and recalled that Dr. Schindler's leave of absence is not truly voluntary, merely a legal vehicle, employed to foreclose any possibility of his being reported to the National Practitioner Data Bank while his cases at issue are externally reviewed."  AR 527.  Nonetheless, counsel for Dr. Schindler and RHP continued to disagree about aspects of Dr. Schindler's compensation in letters dated November 10, 12, and 19, 2009, AR 529–35.  In a letter dated December 23, 2009, RHP agreed to continue to pay Dr. Schindler at his "guarantee amount," AR 553–54, though disputes regarding certain sums RHP alleged Dr.

6

Schindler owed continued at least through April of 2010, *see* AR 574–75; 580–81. In addition, disputes arose regarding moving and medical education expenses, Dr. Schindler's reappointment to the Hospital's medical staff, credentialing, confidentiality, and aerial transportation to and from the Aberdeen clinic. *See* AR 533–35; 542; 553–59; 569–71.

During his LOA, Dr. Schindler continued to manage his clinical practice, both with established and new patients. *See, e.g.*, AR 847, 850–51. Among other things, this included supervising and communicating with his staff and with his nurse practitioner, Karen Mauer. *See* AR 849–50; 859–66; 1640–2037; 2332–2595; 2596–2953; 2956–3538. This also included work at both the Rapid City and Aberdeen clinics,[4] including work before and after the scheduled clinic hours. *See* AR 852–53; 862–64. Indeed, Dr. Schindler's practice was busy enough that a second nurse practitioner, James Parker, was hired in December of 2010. *See, e.g.*, AR 1660; 3660. Moreover, throughout this time period, Dr. Schindler spent time during his LOA actively participating in the peer review process, as explained above.

Dr. Schindler's clinical practice continued through March 1, 2010. *See, e.g.*, AR 211; 864. On March 10, 2010, RHP terminated Dr. Schindler's employment. AR 574–75. Dr. Schindler resigned from the medical staff at the Hospital on March 17, 2010. AR 576–78. The Board of Directors of the Hospital accepted Dr. Schindler's resignation on April 2, 2010. AR 595. The peer review process had not been completed at the time Dr. Schindler resigned from the Hospital. *See* AR 596–97.

Dr. Schindler first saw a doctor—Dr. Stephen Flitman—regarding his symptoms on March 17, 2010. *See* AR 47. Dr. Flitman diagnosed Dr. Schindler with multiple sclerosis and opined that "his condition sufficiently justifies his not working since January 2010." AR 46. Dr. Schindler was 44 at the time of his diagnosis. *See, e.g.*, AR 176. On April 6, 2010, Dr.

---

[4] RHP subsequently discontinued the Aberdeen clinic in early 2010. *See* AR 731–32.

Schindler filed a claim for long term disability benefits, indicating that restrictions and limitations first began on January 1, 2010. *See* AR 44–52.

On April 14, 2010, Unum stated that it had received Dr. Schindler's claim and requested that Dr. Schindler have his employer complete and file certain "Employer section(s) of the claim form." AR 57–58. On May 13, 2010, Margaret Erz, a "Physician/Executive Benefit Specialist" at RHP, filed the "Employer Statement" section of the claim form. *See* AR 76–79. Among other things, this form stated: "On October 16, 2009 Dr. Schindler went on voluntary leave from Rapid City Regional Hospital medical staff and ceased full-time employment working clinic days approximately 2 days per month until his termination in March 2010." AR 77. Along with the form, Ms. Erz also included a single page from Dr. Schindler's employment agreement with RHP. AR 80.

On May 18, 2010, Unum called RHP to discuss certain aspects of Dr. Schindler's employment, including the number of hours he worked through March 1, 2010. *See* AR 187–89. Unum spoke with Ms. Erz, who again stated that Dr. Schindler worked only 2 days per month between October 16, 2009 and March 1, 2010. Ms. Erz also stated that, prior to October 16, 2009, Dr. Schindler was working "in one of the clinics full time 5 days a week and working at least 40 hours a week." AR 188. Ms. Erz indicated that Dr. Schindler received his full salary through February 20, 2010. *Id.* On May 19, 2010, Unum spoke with counsel for Dr. Schindler, Dr. Schindler, and Dr. Schindler's wife. *See* AR 190–92. During this call, Dr. Schindler informed Unum that much of the information Ms. Erz had supplied was incorrect. In addition, counsel for Dr. Schindler informed Unum that it would be "hard to prove" that Dr. Schindler worked more than 34 hours per pay period, as he was not required to punch a time clock. AR 191.

Also on May 19, 2010, counsel for Dr. Schindler wrote to Unum to provide a copy of Dr. Schindler's termination letter. *See* AR 200. The letter from counsel also included a narrative history of the relevant time period written by Dr. Schindler, noting his work at both the Rapid City and Aberdeen clinics. AR 209–12. Finally, this letter notified Unum of counsel's view that RHP "is somewhat adverse to Dr. Schindler because, based upon his disability, he was unable to provide certain services to [RHP] that he was contracted to perform." AR 200.

On May 20, 2010, Unum contacted counsel for RHP, Adam Kirsch, and requested, among other information, that he have "individuals responsible" for the number of hours Dr. Schindler worked for RHP provide a signed written statement including this information for each pay period between October 16, 2009 and March 10, 2010. AR 197–98. The letter included a summary of the information Ms. Erz had previously supplied and also asked that she confirm this information in writing.

On May 24, 2010, RHP responded to Unum's May 20 request for information. *See* AR 225–28. RHP's response included signed statements from Michael McGrath, "Clinic Administrator for Regional Medical Clinic – Neurosurgery," and from John Pierce, Chief Operating Officer of RHP. Regarding Unum's question about the information Ms. Erz had previously supplied, RHP stated that "she is not the proper individual to address the information noted [in Unum's May 20 letter]." AR 226.

Michael McGrath's statement purports to set forth the dates and approximate hours Dr. Schindler worked between October 16, 2009 and March 10, 2010. *See* AR 227. All of the dates and times are for the Rapid City clinic; the letter makes no mention of Dr. Schindler's work at the Aberdeen clinic. The statement additionally notes that, "[o]n the above clinic days, following the clinic times noted above Dr. Schindler would perform dictation/charting for

approximately two to three hours."  The hours detailed by Mr. McGrath do not total 34 hours per

pay period.

The statement of John Pierce responds to the information Unum received from Ms. Erz.

It provides:

> Effective October 16, 2009, Dr. Schindler requested and was granted a Leave of
> Absence from Medical Staff appointment and privileges at Rapid City Regional
> Hospital (RCRH), an affiliate of Regional Health Physicians (RHP).   The
> provision of surgical services at RCRH was a primary focus of Dr. Schindler's
> employment with RHP.
>
> After October 16, 2009, Dr. Schindler's employment with RHP was limited to
> clinic work.  I understand Mike McGrath is providing information with regard to
> Dr. Schindler's clinic work after October 16, 2009.
>
> Dr. Schindler's final worked clinic was March 1, 2010.  RHP terminated Dr.
> Schindler's employment effective March 10, 2010.   Dr. Schindler's final
> paycheck was provided to him on or about February 25, 2010.
>
> Prior to October 16, 2009, Dr. Schindler's practice at RHP consisted of both a
> clinical practice and a surgical practice.  While Dr. Schindler was not working in
> the clinic 5 days per week, his combined clinical and surgical practice involved
> over 34 hours of work per pay period.

AR 228.

Next, on May 27, 2010, Unum wrote counsel for Dr. Schindler seeking additional

information "to understand if there were restrictions and limitations present back to October 16,

2009," rather than only as of January 1, 2010.  AR 221–23.  The letter asked counsel to answer a

series of questions regarding Dr. Schindler's treatment prior to January 1, 2010.  The letter also

sought all letters and responses from RHP to counsel or Dr. Schindler.  Further, the letter asked

whether there had been any complaints or lawsuits filed between Dr. Schindler and RHP and

inquired as to the status of the "compensation issue" between RHP and Dr. Schindler.  Finally,

the letter stated: "We also have information from [RHP] that Dr. Schindler worked very limited

hours from October 16, 2009 through his termination on March 10, 2010.  This verification

indicates that Dr. Schindler did not work the required 34 hours a pay period during the time period of October 16, 2009 through his termination on March 10, 2010." AR 221. Notably, though, this letter did not seek any additional information from Dr. Schindler regarding RHP's "verification." Counsel for Dr. Schindler provided Dr. Schindler's medical records on June 30, 2010, *see* AR 325, and responded to Unum's questions on July 20, 2010, *see* AR 507–09.

On July 30, 2010, Unum had Dr. Jonathan D. McAllister, a specialist in internal medicine, perform a medical review of Dr. Schindler "to determine if the medical records support restrictions and limitations prior to 12/01/09." *See* AR 625–28. In relevant part, Dr. McAllister's review concluded that "[t]he diagnosis of MS has been properly established and is being properly treated" and that "impairment was reasonably supported as of 01/01/10." AR 627. Further, "prior to 12/01/09, the claimant did not report symptoms consistent with debilitating MS," though "the symptoms did seem to significantly worsen in January, 2010." Dr. McAllister concluded: "Therefore, I agree with Dr. Flitman's assessment that restrictions and limitations would have been reasonably supported beginning in January, 2010. However, there is insufficient evidence to warrant restrictions and limitations before that time . . . ." AR 628.

By letter dated August 10, 2010, Unum denied Dr. Schindler's claim. AR 631–36. In general, Unum's rationale for the denial was as follows. Dr. Schindler did not work the required 34 hours per pay period between the dates of October 16, 2009 and March 1, 2010, and thus he was not in "active employment" within the meaning of the Plan. However, Dr. Schindler took a LOA from the Hospital on October 16, 2009, and the Plan states that "[i]f you are on a leave of absence, and if premium is paid, you will be covered through the end of the month immediately follows the month in which your leave of absence begins." So, under the Plan, Dr. Schindler's coverage would have ended on November 30, 2009. Unum's on-site physician agreed that

January 1, 2010 "would be the first date that restrictions and limitations would be present," and thus it "established January 1, 2010 as Dr. Schindler's date of disability."  Unum evaluated whether Dr. Schindler's LOA was related to his disability, presumably to determine whether restrictions and limitations were present prior to January 1, 2010, but it did not find any evidence that it was.[5]  Accordingly, Unum determined that Dr. Schindler's coverage ended as of November 30, 2009.  Because there were no restrictions or limitations "in place" as of that date, Unum did not approve benefits.  *See generally* AR 632–33.

On April 6, 2011, Dr. Schindler appealed Unum's denial of benefits.  AR 725–38 (appeal brief).  Along with his appeal brief, Dr. Schindler submitted voluminous evidence predominantly intended to address the issue of his hours worked between October of 2009 and March of 2010. *See generally* AR 781–3538.  Two examples of the submitted evidence are the affidavit of Karen Mauer, Dr. Schindler's nurse practitioner, AR 859–66, and Current Procedural Terminology (CPT) codes evidencing Dr. Schindler's clinical production in November and December of 2009 and in January of 2010,[6] AR 1078–1136.

Another example is a letter written by Dr. Schindler summarizing his occupational duties and work activity during the relevant time period, again noting his work at both the Rapid City and Aberdeen clinics.  AR 835–55.  Notably, Dr. Schindler estimated that he worked approximately 142 hours per pay period, including approximately 94 hours per pay period on the peer review matter, during his LOA.  AR 835; 848.  Further, Dr. Schindler explained that both Michael McGrath had John Pierce had very little, if any, personal knowledge of his practice and could not properly opine on his hours worked.  Dr. Schindler averred that his nurse practitioner,

---

[5] Unum based this conclusion on the letters from the Hospital regarding the precautionary suspension and peer review, on counsel for Dr. Schindler's November 3, 2009 representation that Dr. Schindler's LOA was merely a "legal vehicle," and on the absence of evidence of restrictions and limitations prior to January 1, 2010.

[6] Counsel for Dr. Schindler later forwarded to Unum CPT codes evidencing Dr. Schindler's clinical work in July and October of 2009.  *See* AR 3578–3614.

Karen Mauer, worked with him daily during the relevant time period, had personal knowledge of the time he spent working, and thus was the proper party to address the issue. In this regard, Ms. Mauer testified in her affidavit that she personally observed Dr. Schindler work more than 20 hours per week (or at least 40 hours per pay period) between October of 2009 and April of 2010, and she also explained Dr. Schindler's work at both the Rapid City and Aberdeen clinics. AR 860. Dr. Schindler's letter itself included 19 exhibits, including among others the entire employment agreement between Dr. Schindler and RHP, AR 1507–1526; partially "encrypted" copies of his responses in the peer review matter, AR 1211–1445, 1564–1635; a detailed daily summary of his hours worked between October 2009 and October of 2010, AR 1164–1207, 1449–1505; and a copy of his family calendar, AR 2039–64. The letter also included as an exhibit hundreds of pages of emails between Dr. Schindler and Karen Mauer. *See* AR 1640–2037 (emails dated between October 19, 2009 and February 27, 2010); 2332–2595 (emails dated between December 2, 2009 and February 2, 2010); 2597–2953 (emails dated between April 29, 2010 and October 22, 2010); 2956–3538 (emails dated between February 2, 2010 and April 28, 2010).

Dr. Schindler's appeal brief highlights some of this evidence in arguing that he worked the required minimum number of hours at least between October of 2009 and January of 2010, the date Unum determined that he was disabled, and in any event through March of 2010, when he was terminated. For example, Dr. Schindler pointed to the CPT codes which he alleged evidence his continued clinical practice, the fact that he worked in both the Rapid City and Aberdeen clinics, and his work with respect to the peer review process during his LOA. Further, Dr. Schindler emphasized the distinction between his clinical work and his surgical work at the Hospital, explaining that although he was on LOA from surgical work at the Hospital, which was

13

not his employer, he was not on LOA from RHP or his clinical practice.  *See generally* AR 725–38.

On June 30, 2011, Unum wrote to Frank Sheeder, Esq., counsel for RHP.  AR 3558–59.  In this letter, Unum noted the Plan's minimum hours requirement and mentioned the information it had previously received from Michael McGrath of RHP regarding Dr. Schindler's hours worked.  Unum then stated that that information "differs from" Dr. Schindler's detailed daily summary of his hours worked, which as noted above Dr. Schindler submitted as an exhibit to the letter he wrote accompanying his appeal brief.  Unum included a copy of Dr. Schindler's detailed daily summary and requested that Mr. Sheeder review the document.  Unum further requested that Mr. Sheeder comment on whether Dr. Schindler's documentation "accurately reflect[ed] the number of hours Dr. Schindler was performing the duties of his regular occupation per pay period during the period of October 16, 2009 and March 10, 2010."  If the documentation did not, Unum requested that Mr. Sheeder provide "written documentation of the hours RHP indicates Dr. Schindler was performing the duties of his regular occupation per pay period during the period of October 16, 2009 and March 10, 2010."  Of the extensive evidence Dr. Schindler submitted on appeal, Dr. Schindler's daily summary was the only evidence Unum sent to RHP for comment.

Unum never received a written response from RHP to its letter.  However, on July 29, 2011, Mr. Sheeder called Unum and stated that "RHP feels that they have submitted written and signed statements regarding the time worked by Dr. Schindler during the period in question."  AR 3615.  Further, he explained that RHP does "not have anything further to add and [does] not wish to get involved at this point."  *Id.*  Unum requested a written confirmation of this statement, *id.*, but RHP again failed to provide one, *see* AR 3640–41.

14

Then, on September 15, 2011, Unum denied Dr. Schindler's appeal. AR 3624–29. As with its initial decision, Unum concluded that restrictions and limitations were not present prior to January 1, 2010, as "[n]o medical documentation has been submitted to indicate any physician was providing restrictions and/or limitations prior to" that date. AR 3626. Also like its initial decision, Unum determined that Dr. Schindler did not meet the Plan's minimum hours requirement after October 16, 2009. In reaching that decision, Unum again relied on the previously-submitted statements of Michael McGrath and John Pierce of RHP. *See* AR 3625–26. Unum also relied on the telephone call from Frank Sheeder, counsel for RHP. AR 3626.

Unum noted Dr. Schindler's disagreement with its previous decision on the minimum hours requirement. Although Unum's denial letter states that it "reviewed the information submitted on appeal," it did not discuss that information or address it in any way. *Id.* Indeed, the denial letter states that, "[i]n the process of reviewing a claim and verifying the number of hours worked, we typically do not request a copy of calendars or schedules from the insured but rather we obtain information regarding hours worked from the employer." *Id.* Further, "the employer has also provided signed statements indicating the number of hours Dr. Schindler worked during the period in question and they have indicated on appeal that they stand by their prior statements." AR 3626–27.

Still, Dr. Schindler did persuade Unum that he did not take a LOA from RHP on October 16, 2009, but rather only from his surgical duties. On this point, Unum stated that "[w]e are in agreement on appeal that Dr. Schindler's leave of absence from surgical duties was not a leave of absence from his employer." AR 3627. This did not help Dr. Schindler, however, as the leave of absence provision of the Plan (discussed in Unum's initial decision) no longer applied. Thus, Unum stated that Dr. Schindler's "coverage would have ended on October 16, 2009, which is the

date he was no longer in an eligible group because he no longer met the definition of active employment under the policy as he was no longer meeting the minimum hour's [sic] requirement." *Id.* Accordingly, Unum denied coverage.

Importantly, Unum emphasized that the only viable "next step" for Dr. Schindler (other than filing a lawsuit) would be to submit information from his employer. More specifically, in the denial letter, Unum requested that counsel for Dr. Schindler submit "additional information from [his] client's employer which confirms he worked the minimum hours required under the policy . . . by October 15, 2011." AR 3628. Unum then stated that if it did not receive such information by that date, its decision would be final.

Additionally, in a phone call on September 23, 2011, counsel for Dr. Schindler requested a 45-day extension of time to submit "additional statements from other employees at Regional Health." AR 3642. Apparently drawing a distinction between the employees and administration of RHP, Unum responded that "the information we indicated in the letter that could be submitted was information from Dr. Schindler's employer which confirms he worked the minimum hours required under the policy." *Id.* Unum stressed that it "only stated additional information from the employer could be submitted." *Id.* Further, although Unum "already considered the additional information submitted" on appeal, "the employer has indicated they stand by their original statement regarding the number of hours worked during the period in question." *Id.* In response, counsel for Dr. Schindler stated that "the employer is lying to [Unum]."

On September 27, 2011, Dr. Schindler filed a second appeal. *See* AR 3648–49. Here, Dr. Schindler reiterated that there was "an adversarial relationship between employer and employee," and stated his belief that RHP "is being dishonest in assertions with UNUM and can back up [this] theory through other additional opinions from [RHP's] employees that are

contrary to its administration's assertions." *Id.* Additionally, Dr. Schindler renewed his request for an extension of time to submit additional materials. AR 3649. Unum denied his extension request by letter dated September 29, 2011. AR 3653.

Also on September 29, 2011, Dr. Schindler submitted an additional document to Unum. *See* AR 3660–61. In particular, he submitted a South Dakota Board of Nursing Collaboration Agreement between himself and Karen Mauer, which evidences that South Dakota law required her to work under Dr. Schindler's direct supervision. *See* AR 3662–64. Dr. Schindler noted that "Ms. Mauer, in order to function as a nurse practitioner employed by [RHP], had to be supervised by Dr. Schindler in regard to all of her nursing duties" and that she worked full-time for RHP through March of 2010. AR 3660. Dr. Schindler also explained that he was busy enough in December of 2010 that RHP hired a second nurse practitioner, James Parker, whose "sole responsibility was assisting Dr. Schindler." *Id.*

On October 14, 2011, Dr. Schindler forwarded another letter to Unum, in which he continued to argue that he met the minimum hours requirement. *See* AR 3680–82. Among other arguments, Dr. Schindler asked why Unum had never demanded clarification from RHP regarding his hours worked at the Aberdeen clinic, as RHP's various statements did not mention Aberdeen. On the same date, Dr. Schindler also submitted several statements from former RHP employees and others, including from two physicians who state that they personally observed Dr. Schindler work far more than 17 hours per week and a letter from the pilot who flew Dr. Schindler between Rapid City and Aberdeen in 2009 and through March of 2010. *See* AR 3683– 84; 3699–3711; 3741. Dr. Schindler also submitted letters from himself and his wife. AR 3685– 86 (Mrs. Schindler); 3692–95 (Dr. Schindler). The letter from Mrs. Schindler states that she

"personally observed, and assisted, Dr. Schindler as he worked well over 70 hours per week while on Leave of Absence from the hospital." AR 3685.

Notably, two of the statements Dr. Schindler submitted were from former administrators at RHP. In a letter from Judy Domalewski, the former Clinic Administrator for RHP (and who apparently preceded Michael McGrath at RHP, Pl.'s Mem. Supp. J. 29), she states that she "worked closely" with Dr. Schindler but had "no way of tracking all of Dr. Schindler's time that he spent rendering patient care outside of the clinic." AR 3699. Further, Ms. Domalewski states that Karen Mauer, who "worked very long hours" alongside Dr. Schindler, "would be in a good position to comment on Dr. Schindler's actual working hours providing patient care."[7] AR 3700. Ms. Domalewski also offered to speak with Unum by phone regarding her personal observations of Dr. Schindler's work during her time at RHP. *Id.* Next, in a letter by Dr. Jorge Reyno, the former Chief Medical Officer (CMO) of RHP between July of 2008 and July of 2010, Dr. Reyno states: "While serving as CMO and while Dr. Jay Schindler was an active medical staff member in good standing, I would not have had knowledge of Dr. Schindler's clinical activities beyond his scheduled clinic hours and billing reports." AR 3707.

Finally, Dr. Schindler included an Independent Medical Examination (IME) performed by Dr. Larry Huntoon, also a neurologist, which Dr. Huntoon completed on October 8, 2011. AR 3712–3734. The Huntoon opinion states that, "based on the timeline history of symptoms provided by Dr. Schindler during this IME, Dr. Schindler developed his first disabling impairment due to demyelinating disease in June of 2009." AR 3733.

---

[7] Another physician who shared office space with Dr. Schindler, Dr. William Waller, wrote to the same effect, indicating among other things that "Dr. Schindler had a PA named Karen (last name escapes me) that could provide you with firsthand accounts of how much Dr. Schindler was working during the months in question. . . . I would rely heavily on what her observations were during that time." AR 3701. Dr. Waller also offered to speak with Unum by phone. AR 3702.

On December 9, 2011, Unum denied Dr. Schindler's second appeal, indicating that the additional information he submitted did not change its prior appeal decision. *See* AR 3816–17. Unum first noted that, in its denial of Dr. Schindler's first appeal, it indicated "that, if available, additional information could be submitted from Dr. Schindler's employer which confirmed he worked the minimum hours required under the policy." AR 3816. Unum then stated, "[a]lthough the additional information we received on October 14, 2011 was not from Dr. Schindler's employer, we did include the information as part of the administrative record." *Id.* Importantly, Unum indicated that the information Dr. Schindler submitted did not change its prior decision because it "was not verified by his employer." *Id.* Regarding the hours worked at the Aberdeen clinic, Unum acknowledged that it was "aware of this clinic's existence," in that it was referenced in Dr. Schindler's detailed daily summary of hours worked that Unum sent to RHP. *Id.* However, Unum stated that "RHP indicated that they stand by their prior statements regarding the hours worked." *Id.* Thus, Unum upheld its determination that Dr. Schindler did not work the minimum number of hours after October 16, 2009.

Unum also upheld its determination that there was no medical evidence to support restrictions or limitations prior to January 1, 2010. AR 3816–17. In regards to the IME performed by Dr. Huntoon, Unum noted that the "IME was completed more than two years after the date for which Dr. Huntoon indicates Dr. Schindler developed a disabling impairment." AR 3817. Likewise, Unum stated that Dr. Huntoon's "conclusion is admittedly based on Dr. Schindler's own report of when his symptoms began rather than Dr. Huntoon's actual treatment of Dr. Schindler at the time in question." *Id.* Accordingly, Unum denied coverage.

The instant lawsuit followed.

### III.     STANDARD OF REVIEW

A court reviews a denial of benefits under 29 U.S.C. § 1132(a)(1)(B) "under a *de novo*

standard unless the benefit plan gives the administrator or fiduciary discretionary authority to

determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber*

*Co. v. Bruch*, 489 U.S. 101, 115 (1989).   Where "an ERISA benefit plan vests with the plan

administrator the discretionary authority to make eligibility determinations for beneficiaries, a

reviewing court evaluates the plan administrator's decision for abuse of discretion." *Williams v.*

*Metro. Life Ins. Co.*, 609 F.3d 622, 629–30 (4th Cir. 2010).   Here, the plan states that, "[w]hen

making a benefit determination under the policy, Unum has discretionary authority to determine

your eligibility for benefits and to interpret the terms and provisions of the policy."  AR 121; *see*

AR 161.   Thus, the parties have stipulated, and the court agrees, that this court should apply an

abuse of discretion standard in reviewing Unum's decision to deny Dr. Schindler's claim.

To determine "the reasonableness of a fiduciary's discretionary decision," the Fourth

Circuit has held that a court "may consider, but is not limited to, such factors as:"

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the
> adequacy of the materials considered to make the decision and the degree to
> which they support it; (4) whether the fiduciary's interpretation was consistent
> with other provisions in the plan and with earlier interpretations of the plan; (5)
> whether the decisionmaking process was reasoned and principled; (6) whether the
> decision was consistent with the procedural and substantive requirements of
> ERISA; (7) any external standard relevant to the exercise of discretion; and (8)
> the fiduciary's motives and any conflict of interest it may have.

*Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342–43 (4th Cir.

2000).   "All eight *Booth* factors need not be," and may not be, "in play" in a given case.  *Helton*

*v. AT&T, Inc.*, 709 F.3d 343, 357 (4th Cir. 2013).   In general, a reviewing court should not find

an abuse of discretion where the plan administrator's decision is reasonable, "even if the court

itself would have reached a different conclusion."    *Booth*, 201 F.3d at 340.    A plan

administrator's decision is reasonable as long as the denial of benefits results from "a deliberate, principled reasoning process" and "is supported by substantial evidence." *Williams*, 609 F.3d at 630. Substantial evidence, which "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance," is evidence that "a reasoning mind would accept as sufficient to support a particular conclusion." *Whitley v. Hartford Life & Accident Ins. Co.*, 262 F. App'x 546, 551 (4th Cir. 2008) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)) (internal quotation marks omitted).

## IV. DISCUSSION

### A. Scope of Review

An initial matter for the court is the scope of the Administrative Record available for its review. In particular, in their Joint Stipulation, the parties stipulated that the Administrative Record is set forth in Exhibit 1 thereto. *See* ECF Nos. 41-1 to -30. However, the parties appeared to disagree about whether this court should consider certain documents, specifically certain RHP records responsive to a subpoena Dr. Schindler sent following Unum's final denial of his claim.[8] Some of these records evidence some of the hours Dr. Schindler worked at the Aberdeen, South Dakota clinic during his LOA, hours RHP conspicuously failed to mention in its various statements to Unum. Unum contends that, because this evidence was not before it when it made the benefits decision, this evidence is not within the court's scope of review. *See Stup v. UNUM Life Ins. Co. of Am.*, 390 F.3d 301 (4th Cir. 2004). Dr. Schindler at this point does not contend that the documents should be included within the Administrative Record, but he urges this court to "closely review" the documents because they provide "objective evidence that could have been requested by UNUM from RHP to validate the Aberdeen Clinic's operation." Pl.'s Mem. Supp. J. 6, ECF No. 43.

---

[8] These records are included as Exhibit 2 to the parties' Joint Stipulation. *See* ECF No. 41-31.

The Fourth Circuit Court of Appeals recently addressed the circumstances under which a court may consider evidence that is outside of the Administrative Record in an ERISA denial of benefits case. *Helton v. AT&T, Inc.*, 709 F.3d 343 (4th Cir. 2013). In general, "consideration of evidence outside of the administrative record is inappropriate when a coverage determination is reviewed for abuse of discretion." *Id.* at 352 (citations omitted). This is not an absolute bar, however. Rather, in discussing what evidence a court may consider, the Fourth Circuit has "focused on whether evidence was known to the administrator when it rendered its decision, not whether it was part of the administrative record." *Id.* Moreover, "a district court in many cases may not be able to adequately assess a number of the *Booth* factors in the absence of evidence from outside the administrative record." *Id.* at 354. For these and other reasons, the Fourth Circuit held that "a district court may consider evidence outside of the administrative record on abuse of discretion review in an ERISA case when such evidence is necessary to adequately assess the *Booth* factors and the evidence was known to the plan administrator when it rendered its benefits determination." *Id.* at 356.

The court finds that it is not necessary to consider the evidence in Exhibit 2 to the Joint Stipulation to resolve this case. Although at least some of the evidence in Exhibit 2 to the Joint Stipulation (such as Dr. Schindler's work at the Aberdeen clinic) was known to Unum at the time it made its benefits decision, this evidence is not necessary to adequately assess the *Booth* factors. As set forth above, there is other evidence in the Administrative Record (including some evidence authored by RHP) related to Dr. Schindler's work at the Aberdeen clinic during his LOA. And in any event, as discussed in more detail below, the court has little hesitation finding an abuse of discretion in this case considering only the evidence in the Administrative Record.

B. <u>The Minimum Hours Requirement is a Benefit Requirement</u>

As explained above, the Plan's provisions require that "[e]mployees . . . be working at least 34 hours per pay period."  AR 123.  In Dr. Schindler's case, the parties agree that this would require Dr. Schindler to have been working at least 34 hours every two weeks.  The parties disagree, however, as to whether this requirement in the plan is a "benefit" requirement or an "eligibility" requirement.  In other words, does Dr. Schindler have to have been working at least 34 hours every two weeks in order to be *eligible* for enrollment in the Plan, or does he have to have done so in order to be entitled to *benefits* under the Plan?

The court agrees with Unum that this provision is a condition precedent to receiving benefits under the Plan.  In this regard, to be "actively employed" within the definition of the Plan, an employee "must be working at least the minimum number of hours as described under Eligible Group(s) in each plan."  AR 151.  Further, in a section with the heading "*WHEN DOES YOUR* COVERAGE *END?*," the Plan states that "[y]our coverage under the policy or a plan ends on the earliest of . . . the last day you are in active employment."  AR 129.  Therefore, if Dr. Schindler was not working the required minimum number of hours, he would not have been actively employed within the meaning of the Plan, and his coverage would have ended.

Dr. Schindler points out that the Plan's "Minimum Hours Requirement" does not itself specify that it is a prerequisite to collecting benefits.  Pl.'s Mem. Supp. J. 10.  He argues that "the Plan's language only makes sense" when the minimum hours requirement is considered "as an enrollment eligibility requirement."  *Id.* at 12.  Dr. Schindler then posits a number of hypothetical questions to illustrate his point, such as "How are new employees handled?"  *See id.* at 11.  He also contends that if the minimum hours requirement is a benefits requirement, "an employee who goes on a prolonged vacation or is forced to take a sick leave would lose coverage."  *Id.*

Answering these arguments, however, requires only a quick reading of the Plan document, and thus the court only briefly discusses the relevant Plan provisions. Notably, the Plan clearly specifies when an employee is eligible for coverage in a section entitled "*WHEN ARE YOU ELIGIBLE FOR COVERAGE?*"  AR 128.  It states: "If you are working for your Employer in an eligible group, the date you are eligible for coverage is the later of" either "the plan effective date" or "the day after you complete your waiting period."  *Id.*  The Plan defines the term "waiting period" as "the continuous period of time (shown in each plan) that you must be in active employment in an eligible group before you are eligible for coverage under a plan." AR 154.  Thus, where a plan does not include a waiting period, the earliest date of coverage is also the plan effective date.[9]  Further, the Plan specifies that if an employee is "absent from work due to injury, sickness, temporary layoff or leave of absence," the employee's "coverage will begin on the date [he or she] return[s] to active employment."  AR 128.  Also, "[n]ormal vacation is considered active employment," AR 151, and an employee's "normal vacation time or any period of disability is not considered a temporary layoff or leave of absence," AR 152.

Thus, the court finds Dr. Schindler's argument that the minimum hours requirement is only a prerequisite to eligibility to be without merit.

C.  Unum Abused its Discretion

As discussed above, the Fourth Circuit in *Booth* identified a number of nonexclusive factors which district courts should use to evaluate the reasonableness of a fiduciary's discretionary decision.  At the outset, though, it is important to identify the discretionary decision or decisions at issue.  In this case, Unum's denial of Dr. Schindler's claim was predicated on two

---

[9] This is the case in Dr. Schindler's Plan.  His plan effective date is March 1, 2008, and his waiting period is "none." AR 123.  Thus, Dr. Schindler's plan effective date is also his earliest date of coverage.

discretionary decisions.[10] First, Unum established Dr. Schindler's date of disability as January 1, 2010, as it found no medical evidence that he suffered restrictions or limitations prior to that date. And second, Unum concluded that Dr. Schindler did not work the required minimum number of hours per pay period after October 16, 2009. The import of these two decisions was that Dr. Schindler was not in active employment within the meaning of the Plan and had no coverage as of October 16, 2009, a little more than two months prior to his disability date.

To dispose of the instant motion, however, it is only necessary for the court to address the second of Unum's discretionary decisions. In particular, as discussed in detail below, the court finds that Unum's determination that Dr. Schindler did not work 34 hours per pay period after October 16, 2009 was unreasonable and an abuse of discretion. Because Unum abused its discretion in determining that Dr. Schindler was not working the minimum number of hours (and thus, that he was not actively employed) between October 16, 2009 and March 1, 2010, the reasonableness of Unum's decision that Dr. Schindler did not suffer restrictions or limitations prior to January 1, 2010 is moot.

Initially, the court notes that not all of the *Booth* factors are applicable to its review of this decision. *See Helton*, 709 F.3d at 357. For example, the first factor supports Unum regarding the issue of whether the minimum hours requirement is an eligibility requirement or a benefit requirement, as discussed above. With the court having determined that this provision falls in the latter category, however, the parties have no other disagreement about the language of the Plan with respect to the minimum hours requirement. As set forth in its various denial letters, Unum's determination that Dr. Schindler did not meet the minimum hours requirement was a factual one and did not turn on any other language in the plan.

---

[10] As explained above, Unum's rationale changed slightly after Dr. Schindler's first appeal based on Dr. Schindler's argument that he did not take a LOA from his employer, but rather only from surgical duties at the Hospital.

25

With respect to the second factor, and based on the Plan itself, it appears that the Plan's general purpose and goal was to provide long term disability coverage to certain RHP employees who become disabled. However, there is little evidence in the Administrative Record as to any other specific purpose or goal of the Plan, and in any event this factor does not appear relevant to Unum's factual finding on Dr. Schindler's hours worked. The fourth *Booth* factor, i.e., whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan likewise appears inapplicable. There has been no contention that Unum's interpretation was inconsistent with other provisions in the plan, and there is no evidence in the Administrative Record that its interpretation was inconsistent with earlier interpretations of the plan. Finally, regarding the seventh factor, neither party has alleged the existence of any external standard relevant to Unum's exercise of discretion, and the court is not aware of any.

Of the factors which do apply, however, all favor Dr. Schindler. Consideration of these factors yields the conclusion that Unum was willfully blind to the most relevant information in the record and drew unwarranted conclusions from what little information it relied upon. Unum unreasonably and arbitrarily failed to address reliable, non-employer evidence that Dr. Schindler worked more than 34 hours per pay period. Unum did so despite its awareness of a conflict between Dr. Schindler and his employer, of discrepancies in the information the employer provided to it, and that the employer had little knowledge of the actual hours Dr. Schindler worked. Unum also had a conflict of interest, in that it both had the authority to make benefit determinations and it paid the benefits out of its own pocket, and the potential it would have to pay to Dr. Schindler the maximum monthly benefit over many years made the potential for bias

in claim administration more likely. For these and other reasons discussed below, the court has little trouble finding an abuse of discretion.

Turning to the third *Booth* factor, the materials on which Unum relied are woefully inadequate because it arbitrarily refused to address evidence that did not come directly from RHP or that RHP did not "verify." Unum's decisions make it clear that this was the only type of evidence to which it would assign any weight. For example, Unum's denial of Dr. Schindler's appeal relied only on evidence from RHP,[11] and the only additional information the denial letter solicited was information "from [Dr. Schindler's] employer." AR 3628. Then, in a phone call between Unum and counsel for Dr. Schindler, Unum again stressed that it "only stated additional information from the employer could be submitted." AR 3642. Additionally, in denying Dr. Schindler's second appeal, Unum noted that "the additional information we received on October 14, 2011 was not from Dr. Schindler's employer." AR 3816. Likewise, Unum indicated that the information Dr. Schindler submitted did not change its prior decision because it "was not verified by his employer." *Id.*

Accordingly, Unum relied only on the following employer information in reaching its conclusion that Dr. Schindler did not work at least 34 hours per pay period after October 16, 2009. In its decision on appeal, Unum indicated that it was relying on the statements of John Pierce, the COO of RHP, and Michael McGrath, the Clinic Administrator for Regional Medical Clinic – Neurosurgery. *See* AR 3624–29. Unum also noted the telephone call it received from Frank Sheeder, counsel for RHP, wherein Mr. Sheeder stated that RHP stood by those statements and had nothing further to add. Unum's decision on Dr. Schindler's second appeal merely indicated that the additional information Dr. Schindler had submitted did not change its prior

---

[11] Unum's initial decision simply stated the conclusion that Dr. Schindler did not work more than 34 hours per pay period after October 16, 2009 without explanation.

decision and again referenced the fact that RHP had stood by its prior statements on the hours Dr. Schindler worked.  AR 3816–17.  In sum, Unum relied on two written statements of Dr. Schindler's employer, each comprising a single page of the more than 3800 page Administrative record, and a telephone call from counsel for Dr. Schindler's employer, which is summarized in a third page of the Administrative Record.

In three decisions on Dr. Schindler's claim, Unum only arguably addressed one piece of evidence that Dr. Schindler submitted on the issue of the minimum hours requirement: his detailed daily summary of hours worked.  Even this, however, it merely sent to Dr. Schindler's employer for "comment."  And although RHP did not actually comment on this evidence, instead offering a vague statement through counsel that it stood by its prior positions, this was apparently enough for Unum.

Unum stated that it "reviewed the information submitted [in the first] appeal," AR 3626, and that it "include[d] the information [submitted in the second appeal] as part of the administrative record," AR 3816.  Assuming Unum did actually "review" the evidence Dr. Schindler submitted, there is little evidence Unum analyzed it in any detail or assigned it any weight whatsoever.  Indeed, only in a September 23, 2011 call between Unum and counsel for Dr. Schindler does Unum state that it "already considered the additional information submitted" on appeal.  *See* AR 3642.  However, Unum immediately qualified that statement by noting that "the employer has indicated they stand by their original statement regarding the number of hours worked during the period in question."  *Id.*  It should be clear that meaningfully addressing evidence means doing more than merely checking to see whether the claimant's employer authored or verified it.

Importantly, the Administrative Record is replete with reliable, objective evidence, nowhere mentioned or addressed by Unum, that Dr. Schindler did work more than 34 hours per pay period after October 16, 2009.  By way of example only, Dr. Schindler submitted an affidavit of his nurse practitioner, Karen Mauer, also a former RHP employee.  *See* AR 859–66. In her affidavit, Ms. Mauer states that "[t]here is nobody, other than myself, within Regional Health Physicians who would be in possession of this information."  AR 866.  That statement is corroborated by two of the letters Dr. Schindler submitted with his second appeal, which conspicuously were from former administrators at RHP.  Specifically, the letters from Judy Domalewski, the former Clinic Administrator for RHP, and Dr. Jorge Reyno, the former CMO of RHP between July of 2008 and July of 2010, establish both that RHP administrators had little knowledge of the hours Dr. Schindler actually worked and that Karen Mauer was the best source of information on this point.  Therefore, Ms. Mauer's affidavit appears to be both reliable and deserving of substantial weight on the issue of Dr. Schindler's hours worked.

In that regard, Ms. Mauer's affidavit provides evidence that Dr. Schindler worked substantially more than the hours to which RHP attested.  For example, Ms. Mauer testified that she personally observed Dr. Schindler work at least 40 hours per pay period between October of 2009 and April of 2010.  She detailed the work both she and he did during that time, including explaining his work at both the Rapid City and Aberdeen clinics.  Notably, she also explained the ample work Dr. Schindler was required to do both before and after the scheduled clinic hours. Therefore, Ms. Mauer's affidavit, which clearly calls into question the credibility of RHP's statements, is reliable evidence that Unum nowhere mentioned, much less addressed.

Further, in corroboration of Ms. Mauer's testimony that she and Dr. Schindler were in daily contact, Dr. Schindler provided hundreds of pages of email communications between them.

*See* AR 1640–2037 (emails dated between October 19, 2009 and February 27, 2010); 2332–2595 (emails dated between December 2, 2009 and February 2, 2010); 2956–3538 (emails dated between February 2, 2010 and April 28, 2010).  These emails, most of which were sent on days *other than* the eleven scheduled clinic days Michael McGrath referred to, illustrate that Dr. Schindler was working and providing patient care during his LOA far more than RHP indicated. This makes sense, as South Dakota state law required Dr. Schindler to directly supervise Ms. Mauer in all of her nursing duties, not just on scheduled clinic days. *See* AR 3662–64 (South Dakota Board of Nursing collaboration agreement between Dr. Schindler and Ms. Mauer).

Additionally, Dr. Schindler submitted CPT codes evidencing his clinical production in July, October, November, and December of 2009 and in January of 2010. AR 1078–1136; AR 3578–3614.  For example, based on the court's review of these records, whereas Dr. Schindler had 196 office visits in July of 2009 (when he was not on LOA), he still had 99 in October of 2009, 65 in each of November and December of 2009, and 26 in January of 2010.  Whereas he had 51 consultations in July of 2009, he still had 17 in October of 2009, 16 in November of 2009, 8 in December of 2009, and 3 in January of 2010.  He also had 2 hospital visits in October of 2009 and 9 in November of 2009.  The extent to which these codes correspond to the scheduled clinic hours of which Unum was aware is not clear,[12] but the CPT codes are at the very least further objective evidence of Dr. Schindler's continued work throughout his LOA.  In all likelihood, the CPT codes reflect at least some work that RHP had not mentioned.

Dr. Schindler also repeatedly told Unum that he worked at the Aberdeen clinic during his LOA and that the statement of Michael McGrath only reflected the *scheduled* hours for Dr. Schindler at the Rapid City clinic only.  As noted above, Dr. Schindler submitted several letters which address this issue, including the affidavit of Karen Mauer.  More importantly, though,

---

[12] And Unum did not ask Dr. Schindler or RHP to elucidate this point.

Unum had additional evidence in the form of copies of emails from Michael McGrath and a letter from RHP, both discussing the Aberdeen clinic and acknowledging Dr. Schindler's work there during his LOA.[13] *See* AR 565–66; 569.  Despite its stated intention to rely only on information from RHP, Unum failed to address this employer information when it accepted at face value RHP's statement through counsel standing by the earlier statement of Michael McGrath which did not mention the Aberdeen clinic.  Said another way, even if it were acceptable for Unum to rely solely on information provided by Dr. Schindler's employer, which it was not, Unum actually had information authored by Dr. Schindler's employer showing that Dr. Schindler worked more hours during his LOA than the employer told Unum he worked.[14]

Moreover, as documented above, the Hospital instituted a peer review investigation involving Dr. Schindler's care of certain patients, and this investigation continued throughout his LOA.  Notably, Dr. Schindler's employment contract with RHP requires Dr. Schindler "[t]o actively participate in, and reasonably cooperate with other personnel in, quality assurance, peer review, performance improvement and risk management programs and requirements."[15]  AR 886.  In this regard, Dr. Schindler further provided copies of his responses in the peer review investigation, though in partially "encrypted"[16] form to comply with patient confidentiality laws. *See* AR 1211–1445, 1564–1635.  These documents, all but one of which are dated during Dr.

---

[13] The documents also address Dr. Schindler's travel to and from Aberdeen, which alone likely took several hours and which should be counted as additional hours Dr. Schindler worked during his LOA.

[14] In its denial of Dr. Schindler's second appeal, Unum admitted that it was aware of the Aberdeen clinic.  AR 3816.  Unum contended that it "questioned" RHP about Dr. Schindler's hours at this clinic when it submitted Dr. Schindler's detailed daily summary of hours worked (which also mentions the Aberdeen clinic) to RHP for comment before deciding Dr. Schindler's first appeal.  *Id.*  In reality, though, Unum nowhere mentioned Aberdeen, and RHP never actually commented on Dr. Schindler's detailed summary.  Again, despite evidence to the contrary that was in its possession, Unum was content with RHP's statement that it did "not have anything further to add."  Thus, Unum clearly did not address Dr. Schindler's evidence regarding the Aberdeen clinic.

[15] The court notes that it was Dr. Schindler who provided his entire employment contract to Unum, not RHP.  *See* AR 835; 76–80; 226.  Perhaps tellingly, the portion RHP provided to Unum omitted this provision.

[16] Dr. Schindler appears to have simply converted the font of the body of each response to a faux-Greek font, which generally appears to substitute a Greek letter for certain equivalent English letters.  Thus, the documents are still readable.

31

Schindler's LOA between October of 2009 and March of 2010, certainly took substantial time[17] to prepare that is not reflected in the hours RHP alleged Dr. Schindler worked.

Importantly, Unum does not contend that Dr. Schindler was not working at all in each of the relevant pay periods between October 16, 2009 and January 1, 2010 (his date of disability). Rather, Unum concedes that Dr. Schindler worked at least the *scheduled* hours Michael McGrath set forth for the Rapid City clinic. The only question, then, is whether there was reliable evidence in the record that Unum failed to address showing that Dr. Schindler worked other hours which, when combined with the hours Michael McGrath set forth, total at least 34 hours per pay period. Based on the above discussion, it is this court's view that there clearly is such evidence and that Unum disregarded it without justification.

The Supreme Court has stated that "[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). The Fourth Circuit has applied this principle on a number of occasions, most recently in *Helton v. AT&T Inc.*, 709 F.3d 343 (4th Cir. 2013). *Helton* involved a beneficiary's request to recoup lost pension benefits, which the beneficiary sought after she learned in 2009 that she had been entitled to begin collecting those benefits nearly eight years earlier. *Id.* at 347. The district court found that AT&T, the plan administrator, "unreasonably denied [the beneficiary's] claim and failed to adequately notify her of a material change to its pension plan that allowed her to collect full benefits earlier than she had originally understood." *Id.* On appeal, the Fourth Circuit affirmed, finding among other things that AT&T abused its discretion in denying the beneficiary's request to recoup lost benefits. *Id.* at 348. Discussing the third *Booth* factor, the Fourth Circuit found that AT&T "failed to address key pieces of evidence conflicting with its decision." *Id.* at 359. Importantly, the Fourth Circuit then explained that

---

[17] By Dr. Schindler's estimate, up to 94 hours per pay period, including extensive review of patient history. AR 848.

"[w]hile an administrator has the authority to weigh conflicting pieces of evidence, it abuses its discretion when it fails to address conflicting evidence."  *Id.*; *see also Williams v. Metropolitan Life Ins. Co.*, 609 F.3d 622, 633–34 (4th Cir. 2010) (finding that a plan administrator abused its discretion where, among other things, it "relied on a scintilla of evidence" which did not directly address the claimant's medical problems and disregarded the claimant's treating physicians' conclusions without justification).

As set forth above, Unum deferred entirely to Dr. Schindler's employer and failed to address numerous pieces of evidence which conflicted with its decision.  Unum's decision was supported only by the merest scintilla of evidence which, when properly viewed within the context of the entire Administrative Record, was far from being evidence that a reasoning mind would accept as sufficient to support the conclusion that Dr. Schindler did not work 34 hours per pay period after October 16, 2009.  Therefore, the third *Booth* factor supports Dr. Schindler.

Based simply on the above discussion, the court would also find that Unum's decision was neither reasoned nor principled in accordance with the fifth *Booth* factor.  Notably, though, there are several other reasons why this factor favors Dr. Schindler.  For example, Unum was aware that the best source of information regarding Dr. Schindler's hours worked was not RHP administrators.  Again, Unum knew that Dr. Schindler was a salaried employee, a fact counsel for Dr. Schindler reiterated to Unum early in the claim administration process, when he stated that it would be "hard to prove" that Dr. Schindler worked more than 34 hours per pay period, as he was not required to punch a time clock.  AR 191.  In addition to saying so himself, Dr. Schindler submitted letters from a number of individuals who stated that RHP administrators had little knowledge of the hours Dr. Schindler worked.  The letters of Judy Domalewski and Dr. Jorge Reyno, both former RHP administrators, corroborate this.  Moreover, Dr. Schindler

informed Unum that the person with the most personal knowledge of his hours worked was Karen Mauer.  The affidavit of Karen Mauer and the letters of Judy Domalewski and Dr. William Waller, a doctor with whom Dr. Schindler shared office space, are in agreement.  Under these circumstances, a reasoned and principled decisionmaking process would look to sources other than the employer for additional information regarding the hours Dr. Schindler worked. *See Granite v. Guardian Life Ins. Co. of Am.*, 544 F. Supp. 2d 833 (D. Minn. 2008) (finding an abuse of discretion where an insurer concluded that a salaried employee did not work the required 32 hours per week by demanding only written evidence of hours worked, even though insurer knew that written records would not establish the actual number of hours the employee worked).

Moreover, there were several irregularities with respect to RHP's statements.  First, on May 24, 2010, Michael McGrath of RHP provided Unum with the hours RHP alleged Dr. Schindler worked between October 16, 2009 and March 10, 2010, setting forth hours for the Rapid City clinic only.  AR 227.  On July 20, 2010, however, counsel for Dr. Schindler responded by letter to certain questions Unum had asked and explained that Dr. Schindler worked in both the Rapid City and Aberdeen clinics during his LOA.  AR 507–09.  As explained above, among other documents included therewith, this letter included copies of emails between Michael McGrath and Dr. Schindler and a letter from RHP discussing Dr. Schindler's work the Aberdeen clinic during his LOA.  *See* AR 565–69.  Thus, before Unum had even initially denied Dr. Schindler's claim, it possessed a statement of Michael McGrath of RHP which purports to set forth all of the hours Dr. Schindler worked during his LOA, but which does not mention the Aberdeen clinic, and Unum also possessed documents authored by Michael McGrath and RHP which discuss Dr. Schindler's work at the Aberdeen clinic.

34

Next, when Unum initially called RHP to discuss aspects of Dr. Schindler's employment on May 18, 2010, Margaret Erz, a "Physician/Executive Benefit Specialist," stated that, prior to October 16, 2009, Dr. Schindler was working "in one of the clinics full time 5 days a week."  AR 188.   However, when RHP responded to Unum's May 20, 2010 request for additional information, it stated that Ms. Erz "is not the proper individual to address the information [in Unum's May 20 letter]."  AR 226.  Further, the statement of John Pierce notes that Dr. Schindler was not working in the clinic 5 days per week.  AR 228.

Also, when Unum wrote to Frank Sheeder, counsel for RHP, and submitted Dr. Schindler's detailed daily summary of hours worked, Unum requested a written response from RHP commenting on the evidence.  AR 3558–59.  Not only did Unum not get a written response, it received a telephone call wherein it was told that RHP does "not have anything further to add and [does] not wish to get involved at this point."  AR 3615.  Though one was requested, Unum did not receive written confirmation of that statement, either.

At the very least, these irregularities provide further evidence that RHP either did not know Dr. Schindler's true hours worked or was unwilling to look into the matter and find an employee who did.   In either case, it was not reasoned and principled to rely solely on the statements of such an employer.

Finally, Unum was aware of conflict between Dr. Schindler and RHP during the relevant time period.  Notably, and again early in the claims process, counsel for Dr. Schindler informed Unum of an adverse relationship between RHP and his client.  AR 200.  Moreover, in response to a request from Unum, Dr. Schindler submitted a number of letters between his counsel and RHP which evidence this adverse relationship.  *See* AR 507–08; 524–81.  As detailed above, after Dr. Schindler went on LOA from the Hospital, RHP proposed to substantially reduce Dr.

Schindler's compensation, which Dr. Schindler opposed.  *See* AR 525–35.  Although RHP

ultimately agreed to pay Dr. Schindler his "guarantee amount," AR 553–54, RHP and Dr.

Schindler then began to disagree about whether Dr. Schindler owed it certain other sums, *see* AR

574–75; 580–81.  Further, also during Dr. Schindler's LOA, RHP and Dr. Schindler disputed

moving and medical education expenses, Dr. Schindler's reappointment to the medical staff at

the Hospital, credentialing, confidentiality, and aerial transportation to and from the Aberdeen

clinic.  *See* AR 533–35; 542; 553–59; 569–71.  Although Unum was aware of these disputes

between employer and employee, it relied solely on statements by the employer.

        In light of these facts, a reasoned and principled decisionmaker would have addressed

other reliable evidence in the Administrative Record.  A reasoned and principled decisionmaker

would not have relied solely on statements by an employer which it knew was not the best source

of information about the claimant, which had made conflicting statements and averred that it did

not want to "get involved," and which was adverse to the claimant.  Unum did the opposite.

Therefore, the fifth *Booth* factor also favors Dr. Schindler.

        Turning now to the sixth *Booth* factor, Unum's decision was not consistent with the

procedural and substantive requirements of ERISA.  For example, ERISA requires that

fiduciaries provide "full and fair reviews" of claims for benefits.  29 U.S.C. § 1133; 29 C.F.R.

§ 2560.503-1.  Among other things, this requirement means that a fiduciary's claims procedure

must "[p]rovide for a review that takes into account all comments, documents, records, and other

information submitted by the claimant relating to the claim, without regard to whether such

information was submitted or considered in the initial benefit determination." § 2560.503-

1(h)(2)(iv).  Again, as explained in detail above, Unum failed to address numerous pieces of

evidence in the Administrative Record that conflicted with its determination on the minimum

36

hours requirement and deferred entirely to Dr. Schindler's employer. Thus, Unum's claims procedure in this case in no way took into account all information submitted by Dr. Schindler relating to his claim. For at least this reason, then, Unum's decision was not consistent with ERISA's procedural and substantive requirements, and the sixth *Booth* factor favors Dr. Schindler, too.

Finally, the eighth *Booth* factor favors Dr. Schindler because Unum suffered from a conflict of interest. The Supreme Court has held that where an entity administering an ERISA plan has a "dual role," i.e., it "both determines whether an employee is eligible for benefits and pays benefits out of its own pocket," a conflict of interest is created. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). In this case, as the Plan's insurer, Unum paid benefits out of its own pocket, and RHP, the Plan Administrator, had delegated to Unum the authority to make benefit eligibility determinations under the Plan. *See* AR 155, 161; Def.'s Mem. Supp. J. 31. Thus, "a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits." *Glenn*, 554 U.S. at 108.

However, "the significance of the factor will depend on the circumstances of the particular case."[18] *Id.* In this regard, the Supreme Court explained that a structural conflict of interest "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to,

---

[18] Before *Glenn*, courts in the Fourth Circuit "reviewing a plan administrator's decision applied a 'modified abuse-of-discretion' standard." *Williams*, 609 F.3d at 630.

> Under this prior standard, if a plan administrator had a conflict of interest because the administrator both determined benefit eligibility and paid claims, the administrator's decision was given less deference than if the administrator had no conflict of this nature. In applying that prior standard, we noted that such a conflict would modify the abuse-of-discretion standard according to a "sliding scale," requiring greater objective reasonableness and more substantial evidence in support of a decision depending on the degree of the administrator's financial incentive to benefit itself by reaching a certain outcome.

*Id.* However, the Fourth Circuit has now recognized that *Glenn* "required a change in [the] prior standard" and held "that, instead, courts should view any such conflict of interest as but one factor among the many identified in *Booth* for reviewing the reasonableness of a plan administrator's discretionary decision." *Id.* at 631 (discussing *Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 358–59 (4th Cir. 2008)).

cases where an insurance company administrator has a history of biased claims administration." *Id.* at 117 (citing John H. Langbein, *Trust Law as Regulatory Law: The Unum/Provident Scandal and Judicial Review of Benefit Denials Under ERISA*, 101 Nw. U. L. REV. 1315, 1317–21 (2007)). On the other hand, "[i]t should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Id.*

In this case, the circumstances of Dr. Schindler's potential benefit award suggest a high likelihood that Unum's conflict of interest affected its decisionmaking. Specifically, the monthly benefit under the Plan is "60% of monthly earnings to a maximum benefit of $15,000 per month." AR 123. Because 60% of Dr. Schindler's monthly earnings[19] totals far more than $15,000 per month, *see, e.g.*, AR 5; 39 (Unum's claim profile for Dr. Schindler), he would be entitled to the maximum monthly benefit under the Plan, minus any required offset as set forth in the plan.[20] Further, because Dr. Schindler was 44 years old at the time of his disability, he is entitled to the maximum monthly benefit until he reaches the "Social Security Normal Retirement Age," which in his case is 67 years old. AR 123–24. Thus, if Unum granted Dr. Schindler's claim for long term disability benefits, it was faced with paying the maximum monthly benefit over a period of approximately 23 years. This prospect of paying such a substantial sum may have motivated Unum to rely solely on information from Dr. Schindler's

---

[19] This term is defined on page 12 of the Plan. *See* AR 132.
[20] More specifically, a section of the Plan entitled "*HOW MUCH WILL UNUM PAY IF YOU ARE DISABLED?*" describes the method by which Unum determines an insured's monthly payment. AR 132. Unum multiplies the insured's monthly earnings by 60% and compares this amount to the maximum monthly benefit of $15,000. The lesser of the two is the insured's "gross disability payment." From this, Unum subtracts any deductible sources of income, which are defined in the Plan. The final amount is the insured's monthly payment.

employer—even though, as set forth above, it knew this information was inaccurate or incomplete—while failing to address additional, reliable information in the Administrative Record showing the number of hours Dr. Schindler worked.

Unum contends that it has taken steps to reduce any perceived bias and to promote accuracy. Of relevance to the issue of the number of hours Dr. Schindler worked, Unum states that it "implemented quality management checks on the claims handling process through the use of manager sign offs." Def.'s Mem. Supp. J. 31 (citing AR 690–92; 3630–31). Also, Unum notes that it "had the employer RHP verify Plaintiff's work hours on at least two occasions." *Id.* Further, Unum points out that it "even submitted Plaintiff's submissions on this issue to RHP to gain any insight RHP may have as to Plaintiff's evidence." *Id.* Thus, Unum argues that its determination was not influenced by bias.

The court disagrees. First, the court points out that, of the steps Unum mentioned, only one coincides with the steps the Supreme Court suggested an insurer with a conflict of interest take to reduce bias. More specifically, there is no evidence in the record that Unum "wall[ed] off claims administrators from those interested in firm finances." *Glenn*, 554 U.S. at 117. And although Unum appears to have instituted management checks, there is no evidence that these checks "penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Id.* At best, these reviews seem to merely parrot the reasoning of the decisions themselves.[21] Nowhere does a reviewer raise any question or issue with respect to the decision under review, which given the above discussion makes this court highly skeptical of their rigor. Therefore, although the court acknowledges that management checks may in some cases reduce the

---

[21] The review of Unum's decision on Dr. Schindler's first appeal consists of the following sentence: "Agree with decision." AR 3630.

potential for bias, the court finds that the management checks did little, if anything, to do so in this case.

Next, the court has already explained in great detail above the problems with relying on RHP's verification of Dr. Schindler's hours worked.  Although it was certainly appropriate to seek information from Dr. Schindler's employer, it was inappropriate in this case to rely solely on this information.  Thus, the court finds that this step in no way reduced potential bias. Finally, regarding Unum's allegation that it "submitted Plaintiff's submissions on this issue to RHP," the court first notes that Unum sent only *one* piece of Dr. Schindler's evidence to RHP. Also, as explained above, even though RHP did not actually even comment on this piece of evidence, and even though Unum already had in its possession other evidence that called into question RHP's earlier statements, Unum accepted without reservation the telephonic representation of RHP's counsel that RHP stood by its earlier statements.  Accordingly, the court finds that this step did nothing to reduce potential bias, either.

As a final note on the eighth *Booth* factor, it does not escape this court's notice that, in *Glenn*, the Supreme Court of the United States identified Unum as having a history of biased claims interpretation.  *See Glenn*, 554 U.S. at 117 (citing Langbein, *supra*, at 1317–21, and noting that this article details a history of biased claims administration "for one large insurer"). The Court noted that where an insurer has such a history, the conflict of interest factor may take on "great importance."  *Id.*  However, the Supreme Court did not explain the method by which a court should determine that a particular insurer has a history of bad faith claim interpretation.  It will not always be the case that scholarly articles exist for a particular insurer, and unless a claimant is given the opportunity to take discovery, there may not be evidence in the record of a

bad faith history.[22]    Moreover, that a particular insurer has a history of bad faith claim administration does not necessarily mean that its conflict influenced a claims decision in a given case.

A number of courts have found a history of bad faith based on prior judicial opinions. *See, e.g.*, *Aluisi v. Elliott Manuf. Co. Plan*, 2009 WL 565544, at *2–*5 (E.D. Cal. Mar. 5, 2009) (discussing cases).  Indeed, in his concurrence in *Glenn*, Chief Justice Roberts discussed the forms of evidence which may show that a conflict influenced the claims decision, and in noting that "it may be shown by a pattern or practice of unreasonably denying meritorious claims," he cited to a case which found a bad faith history by examining prior judicial opinions.  *Glenn*, 554 U.S. at 123 (Roberts, C.J., concurring) (citing *Radford Trust v. First Unum Life Ins. Co.*, 321 F. Supp. 2d 226, 247 (D. Mass 2004), *rev'd on other grounds*, 491 F.3d 21, 25 (1st Cir. 2007)). Other district courts disagree with this approach, however, and the Fourth Circuit has not yet addressed the issue.

However, it is not necessary for this court to make a finding that Unum has a bad faith history of claim interpretation, either in order to fully consider the eighth *Booth* factor or to dispose of the instant motion.  In light of the fact that the Fourth Circuit has not yet weighed in on the proper method by which a district court should find that an insurer has a history of bad faith claim administration, this court expresses no opinion in this case on whether Unum has such a history.

In sum, per the Supreme Court's instructions in *Glenn* and the above discussion, this court finds that the presence of a structural conflict of interest in this case was important, but certainly not dispositive.  Based on the Supreme Court's guidance in *Glenn*, the court assigns to

---

[22] In *Helton*, the Fourth Circuit discussed this problem, albeit in a different context, and explained that "a district court in many cases may not be able to adequately assess a number of the *Booth* factors in the absence of evidence from outside the administrative record."  *See Helton*, 709 F.3d at 354–56.

this factor some importance but gives it only slightly more weight than any of the other *Booth*

factors.  The court does so because the circumstances of Dr. Schindler's benefit award suggest a

high potential for bias and because of the inadequate measures Unum took to reduce potential

bias.  However, the court finds it important to note that, even had Unum *not* had a conflict of

interest in this case, in light of its discussion with respect to the third, fifth, and sixth factors, the

court would likely still have found an abuse of discretion.

D.  Unum Improperly Raised Several Arguments for the First Time on Judicial Review

The court identified above the two discretionary decisions Unum made in denying Dr.

Schindler's claim.  Because the court finds that Unum abused its discretion with respect to one of

these discretionary decisions—i.e., the determination that Dr. Schindler did not work more than

34 hours per pay period between October 16, 2009 and March 1, 2010—the issue of whether

Unum abused its discretion with respect to its other discretionary decision—i.e., that Dr.

Schindler was not suffering restrictions or limitations prior to January 1, 2010—is moot.  This

should end the matter, but in its briefs and at the hearing on the instant motions for judgment,

Unum advanced a number of new arguments that it nowhere mentioned in its administrative

decisions on Dr. Schindler's claim.  These arguments, offered for the first time in this litigation,

include: 1) Dr. Schindler was not under the care of a regular physician and thus was not disabled

within the meaning of the Plan, *see* AR 131; Def.'s Mem. Supp. J. 28; 2) Dr. Schindler was also

not disabled because there is insufficient evidence that he suffered a 20% or more loss in his

indexed monthly earnings due to the same sickness or injury, *see* AR 131; Def.'s Reply Supp. J.

8–9, ECF No. 44; and 3) Dr. Schindler was not actively employed within the meaning of the Plan

because work done outside the employer's usual place of business, such as at home or after

normal hours, was not performed "at the direction of" RHP, *see* AR 151; Def.'s Reply Supp. J. 8–9.

Importantly, however, this court cannot consider these arguments. This is because judicial review under ERISA of the denial of a claim for disability benefits "is limited to the reason stated in the denial notice." *Thompson v. Life Ins. Co. of North America.*, 30 F. App'x 160, 164 (4th Cir. 2002); *see Hall v. Metropolitan Life Ins. Co.*, 259 F. App'x 589, 593 (4th Cir. 2007). The Fourth Circuit has explained that, at its foundation, ERISA contains certain procedural safeguards, and fiduciary compliance with these safeguards "is essential to upholding the administrative integrity of this statutory scheme." *Thompson*, 30 F. App'x at 163. For example, ERISA requires that, "[i]n accordance with [applicable regulations], every employee benefit plan shall . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133. Moreover, as the Fourth Circuit noted in *Hall*,

> ERISA's implementing regulations explain that a claimant must initially be provided with, inter alia, "[t]he specific reason or reasons for the adverse determination," and "[r]eference to the specific plan provisions on which the determination is based." 29 C.F.R. § 2560.503-1(g)(1)(i)-(ii). The claimant must then be given "the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits," and the claims administrator must take any such materials submitted into account in deciding the appeal. § 2560.503-1(h)(2)(ii), (iv).

*Hall*, 259 F. App'x at 593. Allowing Unum to present new arguments for the first time in this court would deny to Dr. Schindler the "full and fair" review procedural safeguards that ERISA and its implementing regulations require. *See Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 236–37 (4th Cir. 1997). Therefore, this court "may not" and will not "consider a new reason for claim denial offered for the first time on judicial review." *Thompson*, 30 F. App'x at 164.

E. Remand is Not Appropriate

43

At the hearing on this matter, counsel for Unum requested that this court remand the case to Unum in the event of an adverse decision. The Fourth Circuit has noted that remand may be the appropriate remedy in many cases. *Helton*, 709 F.3d at 359 (citing *Sheppard & Enoch Pratt Hosp. v. Travelers Ins. Co.*, 32 F.3d 120, 125 (4th Cir. 1993)). In particular, this may often be the case where the court believes the plan administrator lacked adequate evidence to make a reasonable decision. *See Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 789 (4th Cir. 1995); *Sheppard & Enoch Pratt Hosp.*, 32 F.3d at 125 (quoting *Berry v. Ciba-Geigy*, 761 F.2d 1003, 1007 (4th Cir. 1985)). Remand is not required, however, *Helton*, 709 F.3d at 359, and a "district court's decision to remand *vel non* will not be disturbed in the absence of an abuse of discretion." *Sheppard & Enoch Pratt Hosp.*, 32 F.3d at 125.

Importantly, unlike cases where the plan administrator lacked sufficient evidence, remand is "particularly" not required "in cases in which evidence shows that the administrator abused its discretion." *Helton*, 709 F.3d at 360. As explained in detail above, Unum had more than sufficient evidence upon which it could have, but did not, make a reasonable decision. The evidence in this case shows that Unum clearly abused its discretion, and in light of this the court finds that remand would be neither productive nor appropriate. The court accordingly denies Unum's request to remand this case.

F.   Dr. Schindler is Entitled to Back and Future Benefits under the Plan

Because this court has determined that Unum abused its discretion and that remand is not appropriate in this case, the court now addresses the issue of damages. Dr. Schindler requests that the court award "Plan-authorized monthly benefits" along with "all back benefits due and payable (both in consideration of any applicable set-off afforded by his ongoing receipt of Social Security disability benefits)." Pl.'s Mem. Supp. J. 33. Regarding the amount of "Plan-

44

authorized" monthly benefits, Dr. Schindler also asks that the court determine whether he is also entitled to "any Progressive Disease Benefit" within the meaning of the plan. *Id.*; *see* AR 144–45.

The court finds the Progressive Disease Benefit provisions inapplicable to this case. Specifically, as explained above, it appears that Dr. Schindler is entitled to the maximum monthly benefit under the plan, or $15,000, as 60% of his monthly earnings is far greater than $15,000. *See* AR 123. The Progressive Disease Benefit is defined on pages 24 and 25 of the Plan, and in general appears designed to protect an insured's level of earnings at the time a progressive disease is diagnosed. *See* AR 144–45. Importantly, however, the Progressive Disease Benefit section of the Plan specifies that "[a]ll of the policy terms and provisions apply to this benefit unless otherwise specified." AR 144. Nowhere does the Progressive Disease Benefit specify that its provisions are an exception to the maximum monthly benefit defined in the plan, and thus the maximum monthly benefit is applicable to the Progressive Disease Benefit. Assuming without deciding that Dr. Schindler's disability of multiple sclerosis would meet the definition of a progressive disease within the meaning of the Plan, the court finds that Dr. Schindler is not entitled to a monthly payment greater than the maximum monthly benefit as a result of the Progressive Disease Benefit section of the Plan.

Turning now to the appropriate measure of damages, the parties generally have not briefed the precise amount Dr. Schindler's monthly benefit would be if he prevailed in this case. Under the Plan, for example, the maximum amount may be offset in certain circumstances, for example where the insured also receives deductible income. *See, e.g.*, AR 123 (noting that the monthly payment "may be reduced by deductible sources of income and disability earnings"). Indeed, it appears to this court that the exact calculation would require information not before the

court.  Therefore, the court cannot determine the precise amount Dr. Schindler is due.  Instead, the court orders Unum to determine and pay to Dr. Schindler all back benefits and all future monthly benefits due in accordance with the terms of the Plan.  The court will retain jurisdiction over this matter in the event that there is a dispute over the amount of the benefit award.

G.  Attorney's Fees and Costs

Dr. Schindler has requested that this court award him attorney's fees and costs required to bring the instant action.  ERISA provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."  29 U.S.C. § 1132(g)(1).  However, the court believes it is premature to address the issue of attorney's fees and costs at this time, at least because Dr. Schindler has not submitted any evidence documenting the amounts he requests. The court will instead address these issues once this case is final, either by a final order of this court that remains unappealed or following a decision of the Court of Appeals for the Fourth Circuit.  At that point, either party may file a motion for attorney's fees and costs in accordance with FED. R. CIV. P. 54(d) and Local Civil Rule 54.02.  Accordingly, Dr. Schindler's request for attorney's fees and costs is denied without prejudice.

V.  CONCLUSION

The court finds that Unum clearly abused its discretion in denying Dr. Schindler's claim for long term disability benefits.  The applicable *Booth* factors all favor Dr. Schindler. Specifically, the materials on which Unum relied are woefully inadequate, as Unum arbitrarily refused to address reliable, non-employer evidence in the Administrative Record.  Also, Unum's decision was neither reasoned nor principled, as it deferred entirely to the employer when it knew that the employer was not the best source of information regarding Dr. Schindler's hours, Unum had evidence conflicting with the employer's statements, the employer told Unum that it

46

did not want to "get involved," and Unum knew that Dr. Schindler had an adverse relationship with his employer during the relevant time period.  Because of Unum's sole reliance on employer-provided information in making its determination regarding the minimum hours requirement, its claims procedure in this case in no way took into account all information submitted by Dr. Schindler relating to his claim.  Thus, Unum's decision did not comply with the procedural and substantive requirements of ERISA.  Finally, Unum had a conflict of interest in this case, and the prospect of having to pay Dr. Schindler the maximum monthly benefit over a period of more than 20 years suggests a high likelihood that Unum's conflict of interest affected its decision making.

In light of Unum's clear abuse of discretion, the court also finds that remand is not appropriate in this case.  Accordingly, the court orders Unum to determine and pay to Dr. Schindler all back benefits and all future monthly benefits due in accordance with the terms of the Plan.  The court will retain jurisdiction over this matter in the event that there is a dispute over the amount of the benefit award.  Finally, the court declines to address the issue of attorney's fees and costs until this case is final, and thus Dr. Schindler's request is denied without prejudice.

IT IS SO ORDERED.

August 19, 2013
Columbia, South Carolina

Joseph F. Anderson, Jr.
United States District Judge